IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JACQUELINE CURRY,

    Plaintiff,                      No. 2:10-cv-2592-JAM-EFB PS

vs.

KAISER FOUNDATION HOSPITALS;
CNA (CALIFORNIA NURSES
ASSOCIATION),

    Defendants.                  <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

      This case, in which plaintiff is proceeding pro se, is before the undersigned pursuant to Eastern District of California Local Rule 302(c)(21). *See* 28 U.S.C. § 636(b)(1). The Permanente Medical Group, Inc. ("TPMG") now moves for summary judgment. Dckt. No. 57. For the reasons stated herein, the undersigned recommends that the motion be granted.

I.    <u>BACKGROUND</u>

      Plaintiff's second amended complaint, which is the operative pleading in this action, alleges two claims against TPMG: (1) wrongful termination in violation of public policy, and (2) racial discrimination in violation of Title VII.[1]  2d Am. Compl. ("SAC"), Dckt. No. 35.

---

[1] In August 2011, the court granted summary judgment in favor of the other defendant in this action, the California Nurses Association ("CNA"), and dismissed plaintiff's first amended complaint against TPMG with leave to amend only as to the two claims now alleged in

1

TPMG now moves for summary judgment on both of those claims. Dckt. No. 57. Plaintiff opposes the motion. Dckt. No. 58.

II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

  A.     Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See N. W. Motorcycle Ass'n v. U .S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex*, 477 U.S. at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the

---

plaintiff's second amended complaint. Dckt. Nos. 34, 37.

claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

B. <u>Plaintiff's Allegations Against TPMG</u>

Plaintiff's second amended complaint alleges that she was terminated by TPMG for not passing a math test pursuant to a math policy. She alleges that she was treated differently in that regard because of her race. *Id.* ¶ 4. She claims that the policy discriminated against her on the basis that other similarly situated white employees were not subjected to the same treatment of testing that she was. 2d Am. Compl., Dckt. No. 35, ¶ 3. Plaintiff contends that white nurses who

3

1  do the same work as plaintiff were offered remediation, as provided in the math policy contract,
2  but that plaintiff, who is African American, was not offered such remediation. *Id.* Plaintiff also
3  contends that she was segregated and treated differently on the day that she took the math test.
4  *Id.* She contends that medical assistants were not subject to the math policy and therefore were
5  treated differently than plaintiff for no genuine, legitimate reason. *Id.* ¶¶ 5-6. Plaintiff also
6  alleges that the math policy requirement and practices "are a sham," are not a business necessity,
7  and are used for discriminatory purposes. *Id.* ¶ 7.1. She alleges that testing was used for the
8  purpose of budget cutting and decreasing minority positions. *Id.* Plaintiff contends that she was
9  not given a warning that not passing a math test would be grounds for termination and therefore
10 the TPMG did not follow its policies, practices, and procedures in their employment handbook
11 and in the TPMG agreement with the union contract. *Id.* ¶ 7.3. She also contends that the math
12 policy statement was given to her after she was terminated and that she had no knowledge of the
13 policy during her employment with TPMG. *Id.*

14       C.      <u>Undisputed Facts</u>

15 In 2002, plaintiff, who is an African American female, accepted a position as a registered
16 nurse with TPMG. Dckt. No. 57-2, TPMG Stmt. of Undisp. Facts ("SUF") 1, 2.[2] In 2008,
17 TPMG enacted the "Medication Math Testing for RNs and LVNs" policy (the "Math Policy").
18 SUF 3. The Math Policy required those employees who administer or verify medications to
19 annually complete and pass a math test, with a score of at least 90 percent. *Id.* A person who
20 fails to achieve a passing score after three attempts would be terminated. *Id.*

21 In the last week of November 2008, plaintiff was informed of the testing requirement of
22 the Math Policy and she received a study packet from Marsha Thompson ("Thompson"). *Id.* ¶ 4.
23 Plaintiff attempted the math test on December 8, 2008 but failed to achieve a passing score. *Id.*
24 ¶¶ 5-6. After grading the exam, Thompson briefly reviewed the test with plaintiff and informed

---

[2] All citations to the Statement of Undisputed Facts herein incorporate by reference those citations stated therein in support of each undisputed fact.

4

plaintiff that she would have to take the test a second time. *Id.* ¶ 7.

On December 15, 2008, plaintiff failed a second medication math test. *Id.* ¶ 8. Again, after grading the exam, Thompson briefly reviewed the test with plaintiff and informed plaintiff that she would have to take the test a third time. *Id.* ¶ 9. Thompson told plaintiff that because she failed the second test she would be off-duty for one week; plaintiff did not work for the following week. *Id.* ¶ 10. Thompson also gave plaintiff a 70 page study packet. *Id.* ¶ 11.

On December 22, 2008, plaintiff attempted the math test for a third time, again failing to achieve a passing score. *Id.* ¶ 12. On December 24, 2008, TPMG terminated plaintiff's employment as a result of[3] her three math test failures. *Id.* ¶¶ 3, 13.

After plaintiff was terminated, plaintiff's union representative negotiated a deal with TPMG, whereby TPMG agreed to provide plaintiff with an educator to prepare for the math test, to allow plaintiff an opportunity to re-take the math test with the educator as a proctor, and to negotiate terms for plaintiff's return to TPMG if plaintiff passed the test. *Id.* ¶ 14. On April 27,

---

[3] Plaintiff disputes very few of the facts set forth in TPMG's Statement of Undisputed Facts. Dckt. No. 58 at 18-23. Plaintiff does dispute TPMG's statements regarding its remedial action guideline program for math test failures and contends that TPMG offered a remediation program/one to one tutoring with an educator before giving a second or third math test. Dckt. No. 58 at 18, 19, 20. However, plaintiff does not provide any admissible evidence in support of that contention. Plaintiff cites to "Answer of CNA Number 4 second paragraph, September 23, 2010," *id.* at 18, but CNA's Answer, which was not verified, is not admissible evidence. Plaintiff also cites to "Boucher describing the [?] for TPMG math test failures," *id.* at 19, but it is unclear what evidence or document that citation is purporting to reference. Finally, plaintiff cites to a "Letter to Tillman dated April 30, 2012," *id.* at 20, which is presumably referring to a meet and confer letter that plaintiff sent to defendants in this action that does not constitute admissible evidence, Dckt. No. 56. Regardless, as discussed below, plaintiff has not provided any evidence that others similarly situated were offered such remediation and plaintiff was not, nor has she provided evidence that she was performing her job in a satisfactory manner. Moreover, as discussed below, defendant has presented evidence of a legitimate, non-discriminatory reason for its decision to terminate plaintiff and plaintiff has not presented any evidence that would rebut that explanation.

Plaintiff also contends that Thompson's job description and expectations of the charge nurse are "completely different" from the actual TPMG job description, citing "exhibit attached." Dckt. No. 58 at 21. Although it is unclear what exhibit plaintiff is referencing, because plaintiff does not dispute that all nurses were required to take and pass the medication math test, whether or not Thompson inaccurately described the duties of a charge nurse is irrelevant.

5

2009, plaintiff was informed of an agreement between her union and TPMG to allow plaintiff to meet with an educator and retest. *Id.* ¶ 15. Plaintiff did not pursue that option. *Id.* ¶ 16.

Marsha Thompson proctored approximately 50 nurses who were required to take and pass the math test. *Id.* ¶ 17. Of those nurses, six failed the test on the first occasion: four Caucasian, one Hispanic, and one African American (plaintiff). *Id.* ¶ 18. Two of those six nurses, a Caucasian and plaintiff, failed the test a second and third time. *Id.* ¶¶ 19-20.

### D. Analysis

#### 1. Title VII Racial Discrimination Claim

TPMG moves for summary judgment on plaintiff's Title VII racial discrimination claim, arguing that plaintiff was terminated in accordance with TPMG's policy requiring the successful completion of a basic math test and plaintiff can present no evidence to show a casual connection between plaintiff's termination and her race. TPMG also argues that plaintiff can provide no evidence that TPMG's stated reason for her termination, the failing of the math test after three attempts, is pretext for unlawful discrimination. Dckt. No. 57-1 at 10-15.

Title VII, 42 U.S.C. §§ 2000e *et seq.*, forbids employment discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825, 829, 834-35 (1976). An employee may show violations of Title VII by proving disparate treatment, a hostile work environment, or retaliation for protected activities. To establish a *prima facie* case of disparate treatment under Title VII, plaintiff must introduce evidence that "give[s] rise to an inference of unlawful discrimination." *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was performing her job in a satisfactory manner, (3) she suffered an adverse employment decision, and (4) she was treated differently than similarly situated persons outside her protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

////

If plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003). Once an employer does so, if the case is a "single motive case," meaning that "the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision," then plaintiff bears the burden of proving the reason was merely a pretext for a discriminatory motive. *Id.*; *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 (9th Cir. 2002) (en banc) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989)). A plaintiff can demonstrate pretext by "directly persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broad. Co.* 350 F.3d 1061, 1066 (9th Cir. 2003) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citation omitted)). "'Direct evidence is evidence which, if believed, proves the fact [of discriminatory or retaliatory animus] without inference or presumption.'" *Godwin v. Hunt Wesson, Inc.*, 150 F.3d at 1221 (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* In contrast, when direct evidence is unavailable, and the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, plaintiff must show "specific" and "substantial" evidence of pretext to survive summary judgment. *Id*. at 1222.

If the case is a "mixed motive" case, meaning that "there is no one 'true' motive behind the decision" and "[i]nstead, the decision is a result of multiple factors, at least one of which is legitimate," *Costa*, 299 F.3d at 856, "it does not make sense to ask if the employer's stated reason for terminating an employee is a pretext for retaliation, when the employer has offered more than one reason for the action that it took." *Stegall*, 350 F.3d at 1067. Therefore, in mixed motive cases, plaintiff must show, by a preponderance of the evidence (either direct or circumstantial), that the discriminatory reason or protected characteristic was "a motivating

7

factor" in the employment decision. *Id.*; *Costa*, 299 F.3d at 857 ("The employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was 'because of' discrimination [or, in this case, retaliation]."). "Once that is done, the employer may escape liability only by proving by way of an affirmative defense that the employment decision would have been the same even if the characteristic had played no role." *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1110 (9th Cir. 1991).

### a. Prima Facie Case

Although the burden of establishing a prima facie case is low, *see Costa v. Desert Palace, Inc.,* 299 F.3d 838, 855 (9th Cir. 2002), here, as discussed below, plaintiff fails to meet that burden. She fails to present evidence upon which a reasonable fact finder could rely to conclude that she performed in a satisfactory manner, or that she was treated differently than similarly situated persons outside her protected class, elements (2) and (4) for demonstrating a prima facie case of discrimination.[4]

TPMG argues that plaintiff has not produced any evidence that she was performing her job in a satisfactory manner. TPMG notes that plaintiff was unable to pass the math test that was required for her position, and that she was treated no differently than similarly situated persons outside her protected class. TPMG further asserts that the math test was given to all nurses regardless of their race and both plaintiff and a similarly situated white nurse were terminated for

////

////

---

[4] Both inquiries are also relevant at the pretext stage (assuming a prima facie case) and are usually analyzed at that stage, *see Hawn v. Executive Jet Management Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). But both elements are nonetheless required to demonstrate a prima facie case to trigger the "commensurately small benefit [of a prima facie case], a transitory presumption of discrimination: the burden of production only shifts briefly to the employer to explain why it took the challenged action, if not based on the protected characteristic. In practice, employers quickly rebut the presumption and it 'drops from the case.'" *Costa*, 299 F.3d at 855.

failing the test three times.[5] Dckt. No. 57-1 at 10-14.

Plaintiff counters that she was otherwise performing her job in a satisfactory manner and suggests that passing the math test should not have been necessary. Dckt. No. 58 at 13. However, plaintiff does not dispute that the math test was required for all nurses. *Id.* at 2. Nor does she dispute that the policy provides that failure to pass will result in termination, or that plaintiff was afforded three opportunities to take the test and she failed three times. *Id.* By her own admission, satisfactory performance meant passing the medication math test and that failure to do so would result in termination. For that reason alone, plaintiff has not stated a prima facie claim of race discrimination under Title VII.

Plaintiff also fails to present evidence that, viewed in the light most favorable to her, establishes that she was treated differently than similarly situated persons outside her protected class. Plaintiff alleges in her second amended complaint (and argues in her opposition) that she was treated differently because (1) white nurses who do the same work as plaintiff were offered remediation, as provided in the math policy contract, but plaintiff was not; (2) that she was segregated and treated differently on the day that she took the first test by being escorted to a conference room to take the test alone, while other nurses took the test in Thompson's office with Thompson present; and (3) medical assistants were not subject to the math policy and therefore were treated differently than plaintiff for no genuine, legitimate reason. Plaintiff also contends that (4) plaintiff was not given a copy of the policy and had no idea that she could be fired if she did not pass the test; and (5) the math policy is a sham and in violation of public policy and was used for discriminatory purposes.[6] Each of those arguments is addressed in turn.

---

[5] The other two elements – that plaintiff is a member of a protected class and that she suffered an adverse employment decision – are undisputed.

[6] In her opposition to the motion for summary judgment, plaintiff also vaguely alleges that Thompson created a "hostile work environment" for plaintiff and other nurses by allowing a nurse who allegedly assaulted plaintiff to continue to work as a charge nurse when plaintiff was absent. Opp'n, Dckt. No. 58, at 9-10. However, none of plaintiff's complaints have alleged a

9

(1) Remediation

Plaintiff's first claim that white nurses who do the same work as plaintiff were offered remediation, as provided in the math policy contract, but plaintiff was not is simply not supported by the record. Plaintiff has not presented any evidence to show that other similarly situated employees were provided with any "remediation," such as classroom or group training or one on one tutoring, that plaintiff was not provided. Plaintiff has not provided any evidence to dispute TPMG's evidence that TPMG did not provide any form of formal remediation beyond study guides to its nurses and that plaintiff was provided the same study materials as all other TPMG nurses. But, even if her evidence established that TPMG had a more comprehensive remediation program than what plaintiff was provided, she has offered no evidence demonstrating that others similarly situated to plaintiff were offered such remediation.

Although the math policy provides that after failing a first exam, the employee will be "required to complete a medication math review program (selected by the employer) within one week of completion of the first examination," section 2.7.1.2, the policy does not state that a formal remediation program involving a classroom setting would be required.[7] Here, the undisputed evidence shows that TPMG provided the 70 page study packet in lieu of a formal remediation program with classrooms. Thompson Decl. ¶ 18. Plaintiff has not presented any evidence demonstrating that TPMG failed to provide that packet, any of the other study tools (the original study guide and the time with Thompson to review the questions answered incorrectly, all of which plaintiff received), or the additional opportunities for testing that were provided to all other TPMG nurses who were required to take the test. And, as mentioned above, plaintiff has not presented any evidence that other remediation programs were offered to other

---

hostile work environment.

[7] The math policy also states that after failing a second time, the "employee will be given one week off to complete a remediation program," section 2.7.2.1. TPMG Ex. C. Plaintiff does not dispute that she was given a week off to study for the third test. Pl.'s Depo. at 194, 228.

nurses.[8] Although plaintiff argues that other nurses at other locations were offered remediation, she does not provide any evidence of that, nor does she establish that those nurses were similarly situated to plaintiff.[9]

Nor has plaintiff presented any evidence that any failure by TPMG to provide her with adequate study resources or other remediation was racially motivated. To the contrary, the undisputed evidence establishes that plaintiff was advised of the math test, administered the math test like all other employees, and terminated in accordance with the math policy after her third

////

////

---

[8] Plaintiff argues that TPMG might have had a remediation program, but she does not know about it because TPMG did not respond to her discovery requests. Opp'n at 4, 5. To the extent that such an argument could be construed as a motion for a continuance under Rule 56(d), such a motion should be denied. Rule 56(d) permits a court to deny or continue determination of a motion for summary judgment "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition. . . ." In order to justify a continuance or denial of summary judgment under Rule 56(d), a party must satisfy the following requirements: (1) it has set forth in affidavit form the specific facts it hopes to elicit through further discovery; (2) the facts sought exist; and (3) the sought after facts are essential to oppose summary judgment. *Family Home and Finance Ctr. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir.2008). The party seeking the continuance must also show that it diligently pursued previous opportunities for discovery. *Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994); *compare Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1193 (9th Cir. 1980) (motion improperly denied when party had "no previous opportunity to develop evidence . . . crucial to material issues in the case. . . .").

Here, not only does plaintiff not present such an affidavit or declaration, but she does not argue that the motion should be continued or denied under Rule 56(d). She also has not established that the facts sought exist or that they are essential to oppose summary judgment. If she had, she cannot establish that she diligently pursued previous opportunities for discovery. Rather, in addressing a motion to compel in March 2012, it was clear to the court that there had been no meaningful attempt to meet and confer as to discovery and the motion was denied without prejudice. Dckt. No. 52. Plaintiff was specifically provided a further opportunity to file the motion. *Id.* ("The parties are directed to meet and confer either telephonically or in person in an effort to resolve this dispute without court intervention. If such meet and confer efforts do not resolve the discovery dispute, plaintiff may re-notice the motion to compel for hearing. In any re-noticed motion, plaintiff shall specifically identify what discovery requests are at issue."). However, plaintiff chose not to re-file the motion to compel.

[9] Further, to the extent plaintiff suggests that TPMG *should* have had a remediation policy (other than the 70 page study packet), that argument fails since plaintiff has not presented any evidence of disparate treatment.

11

failed attempt to pass the test.[10] SUF 4-13. If anything, it appears from the evidence that plaintiff was treated more favorably than other employees because after she failed the test, she was given the opportunity to take the test a fourth time and also offered the benefit of a private educator, a privilege not afforded to other nurses. SUF 14-16.

### (2) Different Treatment on First Day of Test

Plaintiff also claims that she was treated differently on the day of her first math test; specifically, plaintiff claims that she was escorted to a conference room to take the test alone, while other nurses took the test in Thompson's office with Thompson present. However, as TPMG argues, the circumstantial evidence as to the administration of the test, as presented by plaintiff, does not permit an inference of racial discrimination. Thompson has proctored math tests for approximately 50 nurses, including plaintiff. SUF 17. Six nurses have failed the medication math test under Thompson's proctoring – four Caucasian, one Hispanic and one African-American (plaintiff.) SUF 18. A total of two nurses failed the second and third medication math test proctored by Thompson (one Caucasian and plaintiff). SUF 19. Plaintiff does not allege any evidence of racial discrimination against Thompson other than the fact that Thompson placed plaintiff in a room alone to take a test. Plaintiff does not present any evidence

---

[10] With regard to *when* plaintiff was given the 70 page study guide, plaintiff contends that she received the original, small study packet again after the first test, Pl.'s Dep. at 86, and that she did not receive the more comprehensive 70 page study packet until after she took the second test. Pl.'s Dep., Dckt. No. 57-4, Ex. B, at 91, 93, 124. Thompson contends that all six nurses who failed the first test (four white, one hispanic, and one black (plaintiff)) were "treated . . . the same way." Thompson Decl. ¶ 15. However, she also suggests (based on the order of her declaration) that she gave plaintiff the 70 page study packet after she failed the first test, *not* after she failed the second test. Thompson Decl. ¶ 18. Nonetheless, because plaintiff has offered no evidence as to when other similarly situated employees received the study packet, plaintiff has not shown that she was treated differently than similarly situated persons outside her protected class.

Assuming plaintiff had offered such evidence, she still would not get past the prima facie stage because, as discussed above, she has provided no evidence demonstrating that she was performing her job in a satisfactory manner since she failed the math test three times. Moreover, as discussed below, because plaintiff offered no evidence of any racial animus or pretext, she cannot rebut TPMG's legitimate, non-discriminatory reason for terminating plaintiff. Additionally, after plaintiff was terminated, she was offered an opportunity to meet with an educator and re-test but she decided not to do so. Pl.'s Dep. at 106-08, 295, 326.

that the manner in which she took the test was substantively different from other nurses. While she speculates that Thompson "may have interacted" with the white employees during testing, she concedes that she has no evidence of that. Pl.'s Dep., Dckt. No. 57-4, Ex. B, 19-24 (all plaintiff knows is that Binford and Rogers took the test in Thompson's office; plaintiff heard talking, but admitted she doesn't know what the talking was about). Plaintiff has offered no evidence that either Binford or Rogers was treated differently by taking the test in Thompson's office.[11]

### (3) Medical Assistants Treated Differently

Plaintiff claims that medical assistants were treated differently because they were not subject to the math policy. The medical assistants perform a different job with different requirements and responsibilities than nurses and are not similarly situated to plaintiff with respect to the math test. Plaintiff's real point is that as a nurse, she was treated differently than medical assistants. Title VII does not prohibit requiring nurses to pass a medical math test that is not required of medical assistants. The disparate job requirements are based on the differing responsibilities and not race or some other prohibited reason. The job position of nurse is not a protected class under Title VII. Therefore, the fact that registered nurses may have been treated

---

[11] Nor has plaintiff presented any evidence that there was any racial motivation for the way in which the testing was conducted. In fact, Thompson provides a reasonable, un-rebutted explanation as to why Binford and Rogers took the test in Thompson's office and why plaintiff took it in a conference room, as well as an explanation that she went over Binford's test with her, which would explain the talking plaintiff heard. Thompson Decl. ¶¶ 6-14, TPMG Ex. J, Dckt. No. 57-6. Thompson specifically states that plaintiff "was not in any way disadvantaged by taking the test in the conference room by herself." Thompson Decl. ¶ 9, TPMG Ex. J, Dckt. No. 57-6. The three nurses who took the test on December 8 were all scheduled for the same shift, and they were the only nurses on-duty at the time. The nurses could not, therefore, all take the test at the same time, or there would be no nurses available to supervise patient care. The three nurses' tests were thus staggered to allow at least one nurse to remain on the floor at all times. Plaintiff came to Thompson's office to take the test after Binford had already started her test in Thompson's office and was placed in a separate room to preserve the integrity of the test. Rogers took the test after Binford had completed her test, and was also placed in a room by herself. The only difference in the administration of the test to plaintiff versus that of Binford and Rogers, is that Plaintiff was alone in a conference room just feet away, while the other two took the test, at different times, in an office. There is no evidence that the difference in the room itself was in any way advantageous.

differently than medical assistants does not demonstrate that plaintiff was treated differently than similarly situated persons outside her protected class, as required to establish a prima facie case of discrimination.[12]

####   (4)  No Warning About Failure of Test

Plaintiff also alleges that TPMG did not follow its policies, practices, and procedures in its employment handbook and in the TPMG agreement with the union contract, since plaintiff was not given warning that not passing a math test would be grounds for termination. SAC ¶ 7.3. She contends that the math policy statement was given to her after she was terminated and that she had no knowledge of the policy during her employment with TPMG. *Id.* However, the undisputed facts demonstrate that plaintiff was informed of the testing requirement in November 2008. SUF 4; TPMG Ex. D, Dckt. No. 57-5 at 2 and Thompson Decl. ¶ 5, TPMG Ex. J, Dckt. No. 57-6 at 23 (Thompson sent email to all registered nurses on November 20, 2008 indicating that everyone must pass the math test with a 90% score); Pl.'s Dep. at 54-55 (plaintiff admits receiving a study packet in November 2008 but does not specifically remember getting email from Thompson). Moreover, plaintiff has not provided any evidence that she was treated differently in this regard because of her race.

####   (5)  Math Policy Is a Sham

Plaintiff also alleges that the math policy requirement and practices "are a sham," are not a business necessity, and are used for discriminatory purposes, and that testing was used for the purpose of budget cutting and decreasing minority positions. SAC ¶ 7.1. However, plaintiff produces no evidence in support of this assertion. Rather, she relies only on the fact that she is black and was terminated after failing a math test three consecutive times. The undisputed evidence contradicts plaintiff's speculation by proving that only two employees have been

---

[12] Plaintiff does not argue – nor does she present any evidence demonstrating – that the positions themselves were somehow tied to a protected class (e.g., all medical assistants are white and all nurses are black).

14

terminated pursuant to the terms of the math policy: plaintiff and a white nurse.  SUF 20; Morrison Decl. ¶¶ 2-4, TPMG Ex. H, Dckt. No. 57-6 at 16.

### b.  Legitimate, Non-Discriminatory Reason

Even assuming that plaintiff had presented sufficient evidence to establish a *prima facie* case of disparate treatment based on race (which she has not), TPMG has presented evidence of a legitimate, non-discriminatory reason for its decision to terminate plaintiff.  *Manatt*, 339 F.3d at 800.  Here, TPMG has explained that it implemented the math policy to enhance patient safety, and that in accordance with that policy, plaintiff was terminated for failing the math test three times in a row.  That evidence is sufficient to establish a legitimate, non-discriminatory reason for the adverse action.

### c.  Pretext (Single Motive) and Motivating Factor (Mixed Motive)

As explained above, plaintiff may attempt to demonstrate that the proffered explanation for her termination is a pretext to mask the true motive.  She may do so by "directly persuading the court that a discriminatory [or retaliatory] reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Stegall*, 350 F.3d at 1066.  Alternatively, plaintiff may demonstrate a triable issue by showing (through either direct or circumstantial evidence) that a discriminatory or retaliatory reason was "a motivating factor" in the employment decision.  *Id*. at 1067.  If she does so, defendant can only escape liability by proving that the employment decisions "would have been the same even if the characteristic had played no role." *Sischo-Nownejad*, 934 F.2d at 1110.

Here, as discussed in the analysis above, plaintiff has not presented any evidence – either direct or circumstantial – that would rebut TPMG's legitimate, non-discriminatory reason for its decision to terminate plaintiff.  The evidence demonstrates quite clearly that passing the math test is a legitimate job criteria for the position of a nurse and that plaintiff was treated no less favorably than other nurses in being afforded the opportunity to prepare for and pass the exam.

////

1  Therefore, TPMG is entitled to summary judgment on plaintiff's Title VII disparate treatment
2  claim.

### 2. Wrongful Termination in Violation of Public Policy

It is unclear if plaintiff's second amended complaint purports to state a claim for wrongful termination in violation of public policy under California law.[13] Nothing in the second amended complaint suggests that she does. Nonetheless, TPMG argues that even if the second amended complaint is construed to allege such a claim plaintiff must establish either that the termination violated a statute, such as Title VII, or that the termination contravenes some public policy interest embodied in the Constitution, statute or other law or ordinance. Plaintiff responds in her opposition that TPMG violated "state law public policy" for the same reasons it violated Title VII. Opp'n at 7. Hence, any cause of action for wrongful termination in violation of public policy is derivative of plaintiff's Title VII claim. The Title VII claim fails for the reasons discussed above. Accordingly, the derivative wrongful termination claim fails as well. Therefore, TPMG is also entitled to summary judgment on plaintiff's claim for wrongful termination in violation of public policy. *See Nielsen v. Trofholz Technologies, Inc.*, 750 F. Supp. 2d at 1172 (citing *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996); *Cavanaugh v. Unisource Worldwide, Inc.*, 2007 WL 915223, at *11 (E.D. Cal. Mar. 26, 2007) (internal citations omitted)).

### III. CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. TPMG's motion for summary judgment, Dckt. No. 57, be granted; and

////

---

[13] "In order to sustain a claim of wrongful discharge in violation of fundamental public policy, [a plaintiff] must prove that his dismissal violated a policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision." *See Nielsen v. Trofholz Technologies, Inc.*, 750 F. Supp. 2d 1157, 1172 (E.D. Cal. 2010) (citing *Turner v. Anheuser–Busch, Inc.*, 7 Cal. 4th 1238, 1256 (1994).

16

2. The Clerk be directed to enter judgment for defendants and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 26, 2013.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE